2026 IL App (1st) 231206-U

No. 1-23-1206

First Division
May 26, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 12 CR 4377 |
| v. | ) ) | |
| | ) | Honorable |
| RAKYM JONES, | ) ) | Thomas Gainer, Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court's judgment is affirmed where: (1) the admission of portions of Officer Smith's testimony was harmless error; (2) the court did not err in declining to reopen proofs; (3) defendant's sentence did not violate either the United States Constitution or the Illinois Constitution; (4) defendant's sentence was not excessive.

¶ 2     Following a jury trial, defendant-appellant Rakym Jones was found guilty of two counts of attempted first degree murder and one count of aggravated battery and sentenced to 60 years' imprisonment. On direct appeal, defendant argues that: (1) the trial court erred in admitting

portions of Officer Smith's testimony; (2) the trial court erred in declining to reopen proofs for defendant's motion to suppress; (3) defendant's 60-year sentence violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution; and (4) defendant's sentence is excessive. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4      On January 30, 2012, defendant, who was 17 years old at the time, was arrested. On March 2, 2012, a grand jury indicted him on several counts of attempted first degree murder and aggravated battery based on allegations that, on August 23, 2011, at 16 years old, he and codefendants Gary Moore and Frederick Dean fired multiple shots at a rival gang member, Michael Jackson, with one shot striking 13-month-old Melanie Espejel (Melanie).

¶ 5                               A. Pretrial Proceedings

¶ 6      Pretrial proceedings commenced before Judge Thomas Gainer. On July 10, 2013, the State filed a motion *in limine* to allow proof of other crimes/prior bad acts, specifically seeking to introduce evidence that defendant evaded arrest, provided a false name, and attempted to escape from the interview room after his arrest. On December 18, 2013, over defendant's objection, the trial court granted the motion. However, the court stated that it would not allow "the State to put in evidence of [defendant's] possession of cannabis[,]" and would leave that up to the defense as to "whether or not that's something you want to play out [with] respect to why he ran from the police." The court also stated testimony that defendant was holding his waistband as he ran from the police was "more prejudicial than probative[,]" and therefore barred the introduction of that evidence.

¶ 7      On March 19, 2015, defendant filed a motion to quash his arrest and suppress any evidence as a result of that arrest, arguing that there was no probable cause to arrest him on January 30,

2012. On July 27, 2015, following a hearing, the court denied the motion, finding that the arresting officer had reasonable articulable suspicion that defendant was engaged in criminal activity.

¶ 8    On March 24, 2016, defendant filed another motion to suppress statements. In early 2017, defendant filed three amended motions to suppress statements, culminating with his third amended motion to suppress statements filed on March 8, 2017. Therein, defendant argued that, due to his mental, educational, emotional, and psychological state and physical coercion by the police, he was unable to appreciate and understand his *Miranda* rights.

¶ 9    A hearing on the motion was held on July 10, July 12, and August 3, 2017.

¶ 10    Chicago police officer Brandon Smith testified that, on January 30, 2012, at 9:34 p.m., he was on duty with his partner, Chicago police officer Dennis Huberts. That evening he was dressed in plain clothes, and he and his partner were in an unmarked police vehicle. He observed a group of individuals standing on a corner, and there was loud music coming from one of the cars near the group. Officer Smith stepped out of the vehicle and announced, "Chicago Police," at which time one individual grabbed his waistband and ran away. Officer Smith identified that individual as defendant. Officer Smith followed defendant while repeating "Police. Stop." Defendant fled into a gangway and Officer Smith caught him as he was climbing a chain-link fence into the backyard of a building. Officer Smith grabbed a piece of his clothing and attempted to pull him down from the fence, at which time defendant kicked him in the chest. Officer Smith once again attempted to pull defendant down from the fence and defendant fell to his knees and then stood up. At this point, Officer Smith conducted an "emergency takedown maneuver," during which he grabbed defendant by the waist and took him to the ground with a "hip toss." Officer Smith attempted to place defendant in handcuffs, but defendant was flailing his arms and striking Officer Smith with his elbow. Eventually, his partner arrived and he was able to place the handcuffs on

defendant. Officer Smith testified that he struck defendant on the head with an open palm, called a "open-hand stunning technique," in order to get defendant onto his stomach. Officer Smith testified that neither he nor his partner were armed with a taser and neither threatened to shoot or tase defendant at any time. After placing defendant in a police vehicle, they searched his person and recovered a small amount of cannabis from defendant's right pants pocket. Officer Smith did not see defendant toss anything at any point during the foot chase. He testified that he did not see any injuries on defendant when he arrested him or during processing at the police station. Officer Smith did not learn that defendant had later been taken to the hospital until his shift the following day.

¶ 11    Chicago police sergeant Brian Johnson (then Detective Johnson) testified that, on January 31, 2012, he was employed as a homicide detective, and he was working with his partner Chicago police detective John Dougherty that day. He was assigned to follow up on the initial investigation following defendant's arrest. After familiarizing himself with the case, including the initial incident, *i.e.* the August 23, 2011, shooting, he contacted defendant's mother but was unable to reach her. Around 12:30 p.m., Sergeant Johnson interviewed defendant with his partner present, who read defendant his *Miranda* rights. Defendant indicated that he understood those rights and agreed to speak with them but denied any involvement in the shooting. During that interview, Sergeant Johnson did not observe any injuries or open wounds on defendant. At some point, following that initial interview, Sergeant Johnson checked on defendant in the interview room and discovered that defendant was no longer in the locked room and the ceiling tiles were askew. Defendant was found crawling through the ceiling towards another room. Officers assisted in removing defendant from the ceiling, after which he complained of trouble breathing. He was transported to Roseland Hospital and then brought back to the station.

¶ 12    Sergeant Johnson testified that, later that day, assistant state's attorney (ASA) Latoya Hughes (formerly Crosswell) arrived at the police station. Sergeant Johnson and his partner interviewed defendant again around 5:30 p.m. ASA Hughes then spoke with defendant, after informing him of his *Miranda* rights, and he provided an alibi statement naming Kateri Moore (Kateri). Subsequently, the detectives and ASA Hughes went to speak with Kateri at her residence, and she provided a memorialized statement to ASA Hughes. When they returned to the station, Sergeant Johnson and Detective Dougherty spoke with defendant again, at which point he orally provided an inculpatory statement to them and later to ASA Hughes. At some point that evening, Sergeant Johnson spoke with defendant's mother, and she said she would come to the station. After his mother arrived, defendant indicated that he wanted a lawyer and the interview was terminated. Sergeant Johnson testified that, at no point during any of his contact with defendant did he, or anyone else to his knowledge, ever hit or threaten defendant. Sergeant Johnson further testified that defendant appeared to understand his questions during these interviews and defendant answered clearly and appropriately.

¶ 13    On cross-examination, Sergeant Johnson testified that defendant was provided McDonald's at some point during that day. He confirmed that defendant had dust and drywall on him once he was removed from the ceiling but otherwise he appeared uninjured.

¶ 14    Chicago police officer Lance McClendon testified that, on January 31, 2012, his assistance was requested for the transport of defendant from the police station to Roseland Hospital because he was having trouble breathing. At the hospital, defendant was given a breathing treatment and then he was discharged back to police custody. Officer McClendon did not speak with defendant at any point, but he appeared normal with no visible signs of injury.

¶ 15    ASA Hughes testified that, at 6:30 p.m. on January 31, 2012, she had a conversation with defendant, with Sergeant Johnson present. She introduced herself to defendant and informed him of his *Miranda* rights. He indicated to her that he understood his rights. They spoke for about 45 minutes, during which defendant provided an alibi statement, and ASA Hughes testified that defendant answered her questions appropriately. ASA Hughes later spoke with Kateri and memorialized her statement. Upon returning to the station, ASA Hughes spoke with defendant again, during which she repeated his *Miranda* rights to him and he acknowledged those rights. Sergeant Johnson was also present. During this conversation, which lasted about an hour, defendant provided an inculpatory statement to ASA Hughes and, again, he answered her questions appropriately. She did not observe any injuries on defendant during these conversations. Defendant agreed to provide a handwritten statement, but ASA Hughes decided to wait until his mother arrived, even though the presence of a parent or guardian was not required at defendant's age. In the interim, ASA Hughes spoke with defendant alone, and he affirmed that he was providing this information voluntarily and he did not indicate any abuse or threats from the detectives. After defendant's mother arrived, ASA Hughes read defendant his *Miranda* rights again and on this occasion, she asked for defendant to explain what he understood each right to mean. She then began taking his statement, in the presence of his mother, but, at some point, defendant asked to speak to a lawyer, and the memorialized statement was not completed.

¶ 16    On cross-examination, ASA Hughes confirmed that she was unaware that defendant had been taken to South Shore Hospital the night before and had received stitches on his arm. She could not recall if she knew whether defendant had been provided food. She was unaware whether defendant had slept the previous night.

¶ 17 Defendant testified that, on January 30, 2012, he was 17 years old, and he could not vividly remember the day. He only recalled that he was at a friend's house smoking marijuana and playing video games. When he exited the house that evening, defendant saw a car approach and a man with dread locks stepped out. As the man approached him, defendant became scared and ran away. The man chased him and caught defendant as he was climbing a fence, at which point defendant realized he was a police officer. Defendant was "slammed" to the ground, and they continued to have an "altercation[,]" although defendant denied resisting arrest. Defendant was arrested and eventually taken to South Shore Hospital where he received stitches on his arm and an X-ray of his back.

¶ 18 Defendant was taken to another police station where Sergeant Johnson, who defendant described as "aggressive," questioned him. At some point, this detective punched him in the head and grabbed him by the collar of his shirt, and defendant, who was now "mad and scared," climbed into the ceiling. Defendant testified that he fell through the ceiling into another room. Defendant recalled going to another hospital and receiving a breathing treatment. He testified that, after he returned to the station, Sergeant Johnson was less aggressive. Defendant testified that he had not eaten or slept since his arrest the previous evening and he continued to ask for his mother. When his mother arrived later that evening, defendant spoke with her and then declined to sign any statement and requested a lawyer. On cross-examination, defendant testified that he did not remember Sergeant Johnson informing him of his *Miranda* rights. He also did not remember speaking with ASA Hughes.

¶ 19 Dr. Antoinette Kavanaugh, a private forensic clinical psychologist, testified that she reviewed defendant's criminal history, school records, medical records, police reports in this case,

and child protective services reports. Dr. Kavanaugh interviewed defendant three times, for a total of five and a half hours, and she interviewed defendant's mother on two occasions.

¶ 20    Dr. Kavanaugh acknowledged that, according to his school records, defendant was of average IQ and had significant behavioral problems in school. The records indicated that defendant was more successful at learning while on medication, *i.e.* Concerta and Prozac, for attention-deficit/hyperactivity disorder (ADHD), but he was not consistent with his medication. Defendant had an individualized education plan at school, not because of a learning disability but because of his "inability to manage his emotions and behavior." Although there was a recommendation for therapeutic day school, his mother refused to send him to one. In 2011, defendant was hospitalized at Riveredge Hospital while he was in a juvenile detention center because he repeatedly banged his head against the wall. Those hospital records indicated that he was diagnosed with ADHD and bipolar disorder.

¶ 21    Regarding her first interview with defendant, Dr. Kavanaugh testified that, initially, she did not think defendant was "fully forthcoming" and he was "not presenting in a way" that reflected his ability to accurately recall events. She informed defendant that she would not return to visit him if he was not honest with her. The situation did not improve until after she called counsel to speak with defendant. Dr. Kavanaugh testified that there was no indication that defendant was malingering or feigning cognitive impairment. In assessing defendant's ability to waive his *Miranda* rights, she considered his age, sleep deprivation, marijuana use, injuries, and the lack of food provided to him. Dr. Kavanaugh ultimately opined to a reasonable degree of scientific certainty that defendant "was not able to provide an intelligent waiver of his *Miranda* [rights]." On cross-examination, Dr. Kavanaugh clarified that defendant's lack of understanding of his rights was indicated by his belief that his mother was "interchangeable for a lawyer." She continued that

he did not understand that his mother did not have "the knowledge that a lawyer has in being able to help you in that situation."

¶ 22    Dr. Erick Neu, a forensic clinical psychologist, testified that he was employed with the forensic clinical services of Cook County and he received a court-ordered referral to evaluate defendant's ability to understand his *Miranda* rights. His initial evaluation took place on April 26, 2016, and a follow-up evaluation took place on May 2, 2016. For his evaluation, he reviewed police reports, defendant's criminal history, Dr. Kavanaugh's forensic evaluation, medical records, and school records.

¶ 23    During his interview with defendant, defendant denied having any active medical problems other than asthma and denied any significant head injuries. The only medication he was prescribed was Albuterol for his asthma. Defendant reported a history of substance abuse that included marijuana, codeine, and cough syrup. Dr. Neu testified that defendant was "alert and fully oriented" during the evaluation, he did not appear delusional, his speech was coherent, he did not display any hostility or aggressive behavior, and he did not report any homicidal ideation. Additionally, defendant admitted that he had made suicidal gestures in the past but denied any specific suicidal plan or intent. Rather, defendant admitted to throwing temper tantrums and that he previously made a suicide attempt because he was mad that he was not allowed to make a phone call. Although defendant reported paranoid ideation, he could not give Dr. Neu any specific examples and he did not appear paranoid. Dr. Neu also noted that defendant's mental status appeared the same across the two evaluations.

¶ 24    As to cognitive impairment, Dr. Neu testified that defendant was consistently described in school records as intelligent with an average IQ. Defendant claimed to have a poor memory, but Dr. Neu expressed that it appeared that defendant "was engaging in some oppositional behavior

when he was claiming to not remember things[,] rather than it being a bona fide cognitive dysfunction." Dr. Neu stated that the school records showed that defendant periodically received treatment for attention deficit disorder (ADD), but the records also indicated a significant conduct disorder with a long history of severe behavioral problems. Dr. Neu pointed out, however, that in the four years defendant had been at the Cook County Jail, he had not been diagnosed with ADD. Dr. Neu also stated that defendant had "situationally appropriate negative feelings about being in jail" and he denied any history of symptoms indicative of a mood disorder. Dr. Neu testified that the psychiatrist at the jail made similar observations of defendant, noting that he appeared fully oriented with no cognitive impairment, but nonetheless had behavioral problems with staff and a significant conduct disorder. Similarly, defendant's medical records from his two visits to the hospital after his arrest did not indicate any symptoms of mental illness, confusion, or cognitive impairment. Dr. Neu also testified that he reviewed defendant's behavioral clinical examination (BCX) conducted while defendant was in the Juvenile Detention Center and, therein, a school social worker noted that defendant was capable of controlling his behavior but chose not to.

¶ 25 Additionally, Dr. Neu administered an IQ test to defendant, and after conducting other tests, Dr. Neu concluded that defendant was malingering. According to Dr. Neu, defendant had previously scored a 108 on the test but on this occasion scored a 44, indicating moderate mental retardation with the lowest possible score being 40.

¶ 26 Regarding *Miranda* rights, Dr. Neu testified that defendant indicated some familiarity with those rights, mostly gleaned from television shows. Dr. Neu explained each *Miranda* right and defendant was able to then explain each one in his own words. Dr. Neu stated that having a conduct or behavioral disorder would not affect one's ability to understand those rights. Ultimately, Dr.

Neu opined, with a "reasonable degree of psychological and scientific certainty[,]" that "defendant would have been capable of understanding his *Miranda* warnings at the time of his statements."

¶ 27    On October 19, 2017, the court denied the motion to suppress defendant's inculpatory statements, specifically rejecting defendant's claim of physical coercion by the police and finding Dr. Neu's testimony "more compelling" than Dr. Kavanaugh's testimony.

¶ 28    Previously, in July 2016, the State had disclosed to the defense that Judge James Obbish, in *People v. Williamson*, No. 14-CR-1872, made findings regarding the testimony of Sergeant Johnson that may impact his credibility. In that case, it was alleged that the defendant fired a gun into the air, was shot by a police officer, and was subsequently arrested. Sergeant Johnson went to the hospital to interview the defendant and claimed that the defendant confessed. A motion to suppress in that case was heard by Judge Obbish and was ultimately granted. In particular, Sergeant Johnson testified that he documented the hospital staff who denied him permission to speak to defendant, but he did not document the name of the person who did grant him permission, and Judge Obbish stated that was "one of the biggest pieces of garbage" he had ever heard from a member of law enforcement.

¶ 29    Two motions were filed related to the State's disclosure in the case now before us. On December 12, 2016, the State filed a motion *in limine* to preclude admission of Judge Obbish's credibility findings made in *Williamson* as related to Sergeant Johnson. On December 7, 2017, defendant filed a motion to reopen proofs to present this evidence in his motion to suppress statements or, alternatively, to admit this evidence at trial.

¶ 30    On December 19, 2017, the court conducted a hearing and took the two motions under advisement. Defendant then requested to proceed *pro se*. The court advised defendant against representing himself and allowed him time to hire private counsel. On June 19, 2018, private

counsel, Bernard Shelton, entered his appearance to represent defendant, and the public defender's office withdrew its representation.

¶ 31    On January 9, 2019, Judge Hennelly was assigned to preside over the case as Judge Gainer had retired. The parties advised the court that they were awaiting a ruling from the court regarding the motion to reopen proofs.

¶ 32    On February 26, 2019, the court denied the motion to reopen proofs, stating that it was "abundantly clear" that, under Illinois law, "the request is not permissible under the rules of evidence." Relevant here, the court then asked the parties about the State's 2013 motion *in limine* to allow proof of other crimes and bad acts. The State advised the court that Judge Gainer granted the motion and defense counsel agreed that was his understanding as well.

¶ 33                                    B. Trial

¶ 34    On January 13, 2020, defendant's jury trial commenced.

¶ 35    Angelica Tanner testified that she has two daughters, Melanie and Riley. On August 23, 2011, she was living with her parents and her siblings, Yesenia, Isaac, and Juan, at 8350 South Muskegon Avenue. At that time, her sister, Yesenia, was 15 years old, and her daughter, Melanie, was 13 months old. That morning, Yesenia took the family dog for a walk and Melanie, who could walk with some assistance, went with her. When they returned a short time later, Yesenia was screaming and Melanie was crying with blood on her head. Angelica and her parents took Melanie to Trinity Hospital. Melanie was soon transferred to Lurie's Children's Hospital, where she remained for three weeks and she received follow-up treatment and rehabilitation. Angelica testified that Melanie, who was nine years old at the time of trial, is in a wheelchair and has braces for her feet. Melanie cannot eat on her own and has a feeding tube. She also cannot use the bathroom on her own and remains in diapers. Due to her traumatic brain injury and the loss of

oxygen, she has difficulty comprehending what she is doing without losing her train of thought. Her vocabulary consists of only a few words.

¶ 36    Yesenia Espejel testified that she and her niece, Melanie, were on a walk with their dog at the time of the shooting. Near the corner of 84th Street and Burnham Avenue, she bent down and placed Melanie on her knee and soon after she heard a popping sound, like fireworks. Yesenia did not see any people outside at the time. She testified that she heard the popping sounds closer to her and then she saw one man on a bike and another man chasing him with a black gun in his hand. She heard many gunshots and then looked down at Melanie and noticed that she was bleeding from the right side of her head. She ran back to the house with Melanie and handed her to her mother. Her parents and sister took Melanie to the hospital while she remained behind. Later that evening, Yesenia went to the police station with her father and viewed two lineups but did not identify anyone from those lineups. She returned to the police station on January 31, 2012, to view another lineup and did not make an identification from that lineup either. Yesenia testified that she could only describe the man with the gun as "tall and black" with a black gun and wearing a black shirt and black shorts.

¶ 37    The parties stipulated that Melanie was treated for a gunshot wound to the head at Lurie's Children's Hospital and she remained hospitalized until September 16, 2011. The parties also stipulated that an evidence technician recovered from the scene of the shooting three fired .45-caliber cartridge cases and a .45-caliber fired bullet.

¶ 38    Michael Jackson testified that he was a member of the Latin Dragons gang at the time of the shooting and, while riding his bike near 84th Street and Burnham Avenue, he heard gunshots. He testified that he did not recall seeing any people before the shots and he did not look to see where the gunshots were coming from. He estimated that there were about eight gunshots, one of

which left a hole in his pant leg. He continued riding his bike away from the area and called 911. He further testified that, as he was on the phone, a marked police vehicle hit him and knocked him off his bike. The officers asked if he was the one firing the gunshots, to which he responded in the negative. The officers detained him in the police vehicle and at some point a detective interviewed him.

¶ 39     Jackson testified that he did not recall going to the police station after the shooting and did not recall viewing and signing a photo array. He also did not remember speaking with assistant state's attorney Mikki Miller on August 24, 2011. He does not remember signing a statement and denied that his signature was on the statement. He also did not recall testifying before a grand jury on September 8, 2011.

¶ 40     On cross-examination, Jackson agreed that, after a shooting, as a result of gang rivalries, a gang member may tell the police fictitious things to harm the rival gang. Jackson also agreed that the Conservative Vice Lords were a rival gang to the Latin Dragons. He confirmed that he did not remember telling anyone that he saw defendant shoot at him. He also testified that he may have been under the influence of marijuana when he spoke to police that day.

¶ 41     Chicago police detective James Carlassare testified that he went to the scene of the shooting at approximately 8 a.m. and assisted with the investigation. He spoke with Jackson, who was sitting in the backseat of a police vehicle. Jackson informed him that he left his friend's house and was riding his bicycle when he saw three young people with guns. According to Jackson, one of them yelled "DK b***" at him and then they all started shooting at him. He identified one of the individuals as "Gary" and the one who chased after him as "Negro." He stated that Gary had the loudest gun and Negro, who he said was a Vice Lord, had a smaller gun. He did not know the third person. He described Gary as between 5'10" and 6'0", skinny, and of dark complexion. Detective

Carlassare observed a hole in Jackson's pant leg consistent with a bullet hole. Finally, he testified that Jackson did not appear to be under the influence of alcohol or drugs when they spoke.

¶ 42    ASA Miller testified that, around 8 a.m. on August 23, 2011, she arrived at the police station and was briefed by a detective as to the investigation. Later that day, she spoke with Jackson for about an hour. She testified that he was cooperative and his answers to her questions were responsive and appropriate. He agreed to provide a memorialized statement, and he reviewed that statement with her before signing it.

¶ 43    In the statement, which was read into the record, Jackson stated that he was riding his bike when he saw Gary and Negro, as well as another person with them. He saw that Negro had a semiautomatic weapon and Gary had a "long .22 revolver type gun." Gary yelled, "DK," which meant "Dragon Killer." Negro shot at him at least three times and Gary shot at him at least once. As Jackson pedaled away, he called 911 and later observed a bullet hole in his pants.

¶ 44    Melissa Howlett, a former assistant state's attorney, testified that, on September 8, 2011, she met with Jackson, with a detective present. She also spoke with him alone to ensure he had no complaints about his treatment by the police. After speaking with Jackson, who was cooperative, she prepared to bring him before the grand jury. Jackson's grand jury testimony was then admitted into evidence and presented to the jury.

¶ 45    Jackson testified before the grand jury that, in August 2011, he was a member of the Latin Dragons, who were "at war" with the Vice Lords. On the morning of the shooting, he was riding his bike when he saw "Gary," who held a revolver, "Negro," who held a semi-automatic weapon, "like a 45 or 38, something like that," and a third person who he could not see well. One of them said "DK," meaning "Dragon Killer," and then they all fired their guns in his direction. Jackson pedaled away and called the police, who arrived and placed him in a police vehicle. Jackson denied

being under the influence of alcohol or drugs when he later spoke with a detective. Jackson admitted that he identified Gary and Negro in two different photo arrays.

¶ 46    Codefendant Moore testified that, in exchange for his testimony against defendant, he would plead guilty to one count of attempted murder of Melanie with a sentence of 23 years, to be served at 85%. Moore testified that, in 2011, he, defendant, and Fred Dean were all members of the Conservative Vice Lords gang. On the day of the shooting, Moore was at Dean's grandmother's house where he had stayed the night. They left the house and met defendant. The three planned to "kill a Latin Dragon" because the Latin Dragons had threatened and pointed guns at Moore's cousins a few days prior. Defendant left them and returned with three firearms, one .45-caliber semiautomatic handgun and two .38-caliber revolvers. As they approached the corner of 84th Street and Burnham Avenue, they observed a Latin Dragon (who Moore knew as "Mike Dilla") riding a bike in the street. Defendant said, "DK," to the person, which, according to Moore, means "Dragon killer." All three of them fired their weapons at the person. As this person was riding away, defendant chased after him and continued to shoot at him. Moore lost sight of defendant, and he and Dean ran back to his aunt's house nearby. From inside the house, Moore observed emergency service vehicles and news vans arrive in the area. He believed that one of them had killed Mike Dilla. His aunt, after going outside, informed him that it was a baby that was shot. Moore testified that he did not see a baby while he was shooting at Mike Dilla. Moore placed the guns in the garbage cans behind his aunt's house and never saw them again.

¶ 47    Later that evening, he learned that the police were looking for him, and he, his mother, and Dean went to the police station, where Moore was arrested and taken into custody. Initially, Moore lied to the police about what occurred. However, he later admitted to his role in the shooting. He

spoke with ASA Miller and identified Dean and defendant as the other two shooters, at which time Dean was also arrested and taken into custody.

¶ 48    Glenda Williams testified that she was Moore's aunt and the mother of Moore's cousin who, according to Moore, was threatened by the Latin Dragons. On the morning of the shooting, Williams awoke to the sound of gunshots and discovered Moore and Dean at the back door of her house. She did not observe either of them with a firearm. Worried that her son may have been shot, she went outside and learned that a baby had been shot. Williams testified that she was upset at Moore for being at her house because she knew he was a Conservative Vice Lord and that she lived in Latin Dragons territory. Eventually, Moore and Dean left with Dean's grandmother.

¶ 49    Chicago police detective Keith Allen testified that he and his partner, Chicago police detective Arthur Davis, went to Trinity Hospital, where Melanie had been taken. They spoke with a family member, and then they went to the crime scene. There, Detective Allen spoke with Jackson, who identified two of the three shooters as Gary and Negro. Detective Allen went to the police station where he compiled photo arrays. Jackson was shown two photo arrays, and he identified both Gary Moore and Negro, identified in court as defendant, from those arrays. While at the police station, Jackson also informed Detective Allen that he was a member of the Latin Dragons gang and Moore and Negro were in a rival gang.

¶ 50    Later that evening, Moore, his mother, and Dean arrived at the police station. At the time of his arrival, Moore was under arrest. Dean was later placed under arrest, and his grandmother came to the police station. Detective Allen placed Moore in a physical lineup, which Jackson and Yesenia separately viewed. From that lineup, Yesenia did not make an identification, whereas Jackson identified Moore as one of the shooters. Detective Allen also placed Dean in a physical lineup, viewed by Jackson and Yesenia separately. Neither made an identification from that lineup.

Finally, Detective Allen testified that at no point did Jackson appear to be under the influence of alcohol or drugs.

¶ 51 Officer Smith testified consistently with his testimony at the suppression hearing, including, as relevant to this appeal, the following:

"Q: Officer Smith, when Rakym Jones was running, was he doing anything with his body?

A: Holding his right side.

Q: When he was holding his right side and you were chasing him, did you belief [*sic*] that he may have something on his person?

A: Yeah, I've seen that a lot [of] people holding guns or concealing guns.

Mr. Shelton: Objection, judge.

The Court: I have won't [*sic*] accept it for the truth[,] just for the effect the officer took effectuating the arrest.

Q: Based on his behavior, did you believe he was possibly armed?

A: Yes.

Q: Did you look around the area after he was placed in custody for any weapons?

A: Yes, we did.

Q: Were you able to find anything?

A: No.

Q: Did he have anything on his person?

A: Yes.

Q: What did he have on his person?

A: Ziploc bag containing cannabis.

Q: And that was recovered from him?

A: That's correct."

¶ 52    On cross-examination, the following testimony was elicited:

"Q: You testified that at some point he ran from you; is that right?

A: That's correct.

Q: And you had a concern that he might have been armed; is that right?

A: During the chase, yes.

Q: But he was not armed; is that right?

A: No.

Q: He didn't have any ammunition on him; is that right?

A: No.

Q: No firearm on him; is that right?

A: That's correct.

Q: But he did have contraband and [that] contraband was cannabis; is that right?

A: That's correct."

¶ 53    Sergeant Johnson testified consistently with his testimony at the suppression hearing.

¶ 54    Kateri Moore (Kateri) testified that, in August 2011, she was dating defendant. On August 22, 2011, defendant stayed the night at her house and he left at about 7 a.m. the following morning. She did not see him again that day. On January 31, 2012, two detectives and an assistant state's attorney came to her home and she spoke with them. On cross-examination, Kateri confirmed that she did not know the exact time defendant left but it was routine for him to leave by 7 a.m. because her father would be home from work soon after that.

¶ 55 ASA Hughes testified that, around 6:30 p.m. on January 31, 2012, defendant stated to her and Sergeant Johnson that he was at Kateri's home until 9 a.m. on August 23, 2011. Defendant denied any involvement in the shooting and denied being with Moore and Dean. ASA Hughes and Sergeant Johnson went to Kateri's home to verify his alibi, but she informed them that he left her home at 7 a.m.

¶ 56 Upon returning to the station, ASA Hughes and Sergeant Johnson spoke with defendant again. They informed him of Kateri's statement. Defendant then provided additional information regarding the shooting. He admitted that he left Kateri's home earlier that morning and he saw Moore and Dean. All three of them were armed, defendant with a .38-caliber revolver, and they were looking for Latin Dragons. When they saw Jackson, who they knew to be a Latin Dragon, they all began shooting at him. When he fled, defendant ran after him and continued to fire his weapon. Defendant agreed to memorialize this statement. ASA Hughes testified that, after learning his mother was on the way to the police station, they decided to wait before memorializing his statement. After she arrived and defendant spoke with her, he no longer wished to speak with the detectives and ASA Hughes and declined to memorialize his statement.

¶ 57 Defendant filed a motion for a directed verdict, which the court denied. Defendant did not present any evidence.

¶ 58 The jury found defendant guilty of two counts of attempted murder and one count of aggravated battery with a firearm.

¶ 59 On February 20, 2020, defendant filed a motion for a new trial. On April 12, 2021, the court stated on the record that defendant's private counsel had passed away, and the public defender was reappointed to represent defendant. On June 3, 2022, defendant filed an amended motion for a new trial, arguing, *inter alia*, that: (1) the court erred in granting the State's 2013

motion *in limine*; (2) the court erred in denying his motions to suppress; (3) the court erred in denying the motion to reopen proofs; (4) the court erred in overruling objections to Officer Smith's waistband testimony and in failing to provide a limiting instruction to the jury. Following arguments on July 15, 2022, the court denied the motion.

¶ 60                                        C. Sentencing

¶ 61    Defendant's sentencing hearing took place over multiple dates (August 26 and October 14, 2022, and February 10 and July 7, 2023). Defendant's presentence investigation (PSI) report was submitted to the court.

¶ 62    In aggravation, the State presented the following. The State submitted Melanie's grandmother's victim impact statement. Angelica, Melanie's mother, also read aloud her impact statement to the court. The State then called several witnesses who described instances of defendant's misconduct while in custody.

¶ 63    Investigator Cierra Thurman testified that she investigated an incident involving defendant occurring on October 27, 2015. Thurman watched the surveillance video of the incident. She summarized the incident as follows: "[D]etainees Octavius Grant and [defendant] urinated and spread feces around the day room tier. They also trashed the tier and eventually it ended in a physical altercation with a correctional officer." Regarding the altercation, Thurman testified that when the correctional officer attempted to secure Grant, defendant tackled him and placed him in a headlock before defendant was "taken down" with assistance from other correctional officers.

¶ 64    Thurman testified about another incident occurring on March 8, 2022, where defendant committed aggravated battery of a correctional officer. Specifically, the correctional officer was collecting dinner trays from the cells and defendant refused to return his tray. When the cell was opened to retrieve it, defendant "bust out of the cell, became very combative and started fighting

with [the correctional officer] as well as other officers." In performing an emergency takedown of defendant, the correctional officer struck his head on the concrete floor and defendant was eventually secured in handcuffs. While secured, defendant spat blood and saliva at the officer's face. The correctional officer sustained a concussion.

¶ 65    Correctional officer Ricardo Yanez testified that, on January 14, 2016, defendant refused to comply with another correctional officer's orders. Yanez stepped in to assist the other officer. Defendant became erratic and resisted their efforts to restrain him. The altercation resulted in scratches and bruises to Yanez's arm and bruises on his chin.

¶ 66    Investigator Jose Madrid testified that, on November 30, 2021, defendant was using the phone when he was informed that his time for the phone was over and defendant did not want to hang up the phone. As an officer approached defendant, he struck the officer and spat on him and the officer fell in the struggle to restrain defendant. Madrid testified that the altercation resulted in bruising either on the officer's body or head.

¶ 67    Deputy Heather Nolan testified that, on April 5, 2016, she was assigned to courtroom 302. Defendant was expected to appear before the judge on that day; however, Nolan found defendant masturbating in the lockup area. He ignored her command to stop and she called a supervisor. Nolan made a complaint regarding this incident.

¶ 68    Investigator Edward Barksdale testified that, in March 2015, he was investigating a public indecency incident involving defendant. Barksdale spoke with the correctional officer who witnessed the incident, which occurred on March 23, 2015. Investigator Barksdale was informed that, on that day, defendant was in the shower area, standing on top of a garbage can with his penis in his hand, and calling out to the female correctional officer, "yeah, you like this" or something

to that effect. The correctional officer directed him to stop, which he did, and notified her supervisor of the behavior. Defendant was charged with public indecency.

¶ 69    Sergeant Blake Bochnak testified that, in July 2017, he investigated an incident involving defendant. His investigation revealed that, on July 20, 2017, defendant entered an unauthorized area and grabbed a correctional officer by the waist. Another correctional officer restrained defendant while waiting for backup.

¶ 70    In mitigation, defendant filed an extensive sentencing memorandum, highlighting defendant's youth and attendant circumstances, and attached thereto was a scientific article about adolescent brain development. Also attached were letters of support from his uncle, mother, and a friend. Counsel informed the court that defendant's childhood often lacked consistency, but during the short periods when he had consistent support and structure, defendant thrived. Counsel argued that defendant was not beyond rehabilitation and referenced Dr. Kavanaugh's evaluation of defendant, which concluded that defendant had a serious emotional disability. Counsel requested the minimum sentence. In allocution, defendant stated that this has been a very intense learning experience for himself, and he recognized that the victim and her family had experienced a tragedy.

¶ 71    The trial court vacated the aggravated battery conviction and sentenced defendant to two 30-year terms of imprisonment, to be served consecutively, for the attempted murders of Melanie and Jackson. In ruling, the court stated that it considered defendant's updated PSI and defendant's corrections thereto, defendant's sentencing memorandum, the scientific article attached thereto, all evidence presented in aggravation and mitigation, the parties' arguments, the victim impact statements, defendant's rehabilitation prospects, and defendant's allocution. The court also expressly noted defendant's age at the time of the crime. Further, the court stated that because the

imposed sentence was discretionary and because defendant would be eligible for parole, there was no violation of the eighth amendment.

¶ 72    As to aggravation, the court stated that the crime was gang-related and caused serious harm to a person under the age of 12. As to mitigation, the court addressed each factor and found that, for the most part, they did not apply, other than to the extent that his gang affiliation was the underlying reason for his actions. The court also considered the statutory *Miller* factors, noting defendant's gang influence, the "outrageous" and "shocking" circumstances of the offense, defendant's role in planning to kill a rival gang member, his minimal prior juvenile criminal history, and his lack of remorse and failure to apologize to the family in his statement in allocution. When addressing the factor of "the presence of any cognitive or developmental disability," the court stated:

> "[T]he only element of this is what was referred to in the investigation as emotional disability, not developmental disability. Not cognitive disability but emotional disability. And a careful reading of some of these things indicates that we're bordering on just behavioral problems and an inability to confine himself to rules, regulations, or laws."

¶ 73    Finally, the court addressed "the biggest factor" of "ability of rehabilitation." The court noted defendant's upbringing and childhood but focused on defendant's actions while in custody. The court stated, "99 percent of the people who come before me awaiting sentence always present me with certificates and awards and programs, religious studies, educational studies, vocational studies, anything at all that they can present to mitigate their sentence and to give them credit for their sentence" but defendant had presented nothing demonstrating rehabilitation. Instead, the court was presented with a number of criminal offenses and instances of misconduct, including defendant's attempted escape, multiple cases of battery upon correctional officers, and sexual

misconduct involving female correctional officers. According to the court, there was "not a scintilla of rehabilitative potential" in defendant and defendant is not a "victim of transient immaturity of youth."

¶ 74    On July 7, 2023, defendant filed a motion to reconsider, arguing that his sentence was excessive, the court improperly considered in aggravation matters that are implicit in the offense, the imposition of consecutive sentences was improper, and the sentence improperly penalized defendant for exercising his right to trial. On the same day, the court denied the motion.

¶ 75    This appeal followed.

¶ 76                                    II. ANALYSIS

¶ 77    On appeal, defendant argues that: (1) the trial court erred in admitting portions of Officer Smith's testimony; (2) the trial court erred in declining to reopen proofs for defendant's motion to suppress; (3) defendant's 60-year sentence violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution; and (4) defendant's sentence is excessive.

¶ 78                            A. Other-Crimes Evidence

¶ 79    First, defendant contends that the court erred in allowing Officer Smith to testify at trial that defendant was holding his waistband when he initially ran from police and that the police found cannabis on defendant's person following the arrest. Defendant asserts that this testimony constituted improper other-crimes or bad acts evidence and eliciting this testimony constituted prosecutorial misconduct because the court expressly ruled, following a hearing on the State's motion *in limine*, that this evidence could not be presented at trial. For these reasons, defendant requests that we reverse and remand for a new trial.

¶ 80    Initially, we reject defendant's argument regarding prosecutorial misconduct based on the alleged violation of the trial court's ruling on a motion *in limine*. "A violation of a ruling on a motion *in limine* will constitute grounds for a mistrial 'only when the violation effectively deprived the defendant of his right to a fair trial.' " *People v. Jacobs*, 405 Ill. App. 3d 210, 219 (2010) (quoting *People v. Phillips*, 383 Ill. App. 3d 521, 547 (2008)). Here, on December 18, 2013, the court granted the State's motion *in limine*; however, the court would not allow "the State to put in evidence of [defendant's] possession of cannabis." The court also limited the introduction of testimony that defendant was holding his waistband as he ran from the police, where it was "more prejudicial than probative." Nonetheless, just prior to trial, the court asked the parties about the State's 2013 motion *in limine* to allow proof of other crimes and bad acts. The State advised the court that Judge Gainer granted the motion and defense counsel agreed that was his understanding as well. Because neither party clarified to the trial court that the State was not allowed to present evidence of defendant's possession of cannabis or that he was holding his waistband as he ran from Officer Smith, we decline to consider this "violation" of the trial court's 2013 ruling to constitute prosecutorial misconduct or grounds for a mistrial.

¶ 81    We next turn to the State's argument that defendant's contention as related to the possession of cannabis testimony is forfeited because there was no contemporaneous objection to this testimony during the trial. To preserve a claim of error, a defendant must make both a timely objection and raise the claim in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, specific to criminal cases, where the issued is raised in a motion *in limine*, or in a response thereto, the defendant need not also make a timely objection. *People v. Denson*, 2014 IL 116231, ¶ 18. Therefore, because defense counsel objected to the admission of the cannabis evidence at the 2013 hearing on the State's motion *in limine* and defendant included in his posttrial

motion that the court erred in granting that motion, we find that the issue has been sufficiently preserved.

¶ 82     We review the admission of other-crimes evidence for an abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 83     Generally, all relevant evidence is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 401 (eff. Jan. 1, 2011)). Illinois Rule of Evidence 404(b) (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith *** [.]" However, such evidence may be admissible "if it is relevant for any purpose other than to show the defendant's propensity to commit crime[,]" such as "*modus operandi*, intent, motive, identity, or absence of mistake[.]" *Pikes*, 2013 IL 115171, ¶ 11. Even where relevant, the evidence nonetheless is not admissible if its probative value substantially outweighs its prejudicial effect. *Id.*; see *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980) ("Such evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment.").

¶ 84     Defendant argues that Officer Smith's belief that defendant was armed and defendant's possession of cannabis "shed no light on whether he committed attempted murder" and "improperly suggested his propensity to commit crimes and insinuated he was involved in this gun-related case for that reason." We agree with defendant that this testimony was improperly

admitted at trial. As the trial court stated in 2013, testimony that defendant was holding his waistband while running away from Officer Smith is more prejudicial than probative and should have been barred from introduction at trial. It is also completely irrelevant to the identity of the shooter on August 23, 2011, or any other relevant purpose, such as motive, intent, or absence of mistake. This is particularly true in this case where Officer Smith later clarified that defendant had cannabis in his pocket, he did not possess a firearm, and Officer Smith did not observe defendant toss anything as he was running away. Had the waistband testimony not been admitted, there would have been no need to elicit the cannabis testimony, which is also irrelevant to the August 23, 2011, shooting.

¶ 85     The State contends that this testimony was admissible as "course of investigation" evidence because it "explained why [Officer Smith] chased defendant[.]" We disagree with the State. The basis for Officer Smith's chase and arrest of defendant on January 30, 2012, has little, if any, relevance to the identity of the shooter on August 23, 2011. Certainly it was relevant at the suppression hearing where defendant claimed that Officer Smith lacked probable cause, but it was unnecessary at defendant's trial, at which point the trial court had already determined that there was probable cause for the arrest.

¶ 86     Nonetheless, we conclude that the admission of this testimony did not prejudice defendant and was therefore harmless error.

¶ 87     "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *Lindgren*, 79 Ill. 2d at 140. "Improper admission of other-crimes evidence is harmless if the defendant has not been prejudiced or denied a fair trial, and the State must show beyond a reasonable doubt that the result would have been the same without the

improper admission." *People v. Rosado*, 2017 IL App (1st) 143741, ¶ 40. As such, we consider whether the evidence was a "material factor" in defendant's conviction. *Id.*

¶ 88    Defendant argues that the improper testimony prejudiced him where: (1) there was no physical evidence connecting him to the shooting; (2) the only two eyewitnesses who identified him, Jackson and Moore, were not neutral parties and "had reasons to lie"; and (3) defendant's "alleged confession was far from overwhelming[.]" We disagree for two reasons. First, the waistband testimony could not have been a material factor in defendant's conviction where his counsel confirmed through cross-examination that a firearm was not recovered from defendant's person. Second, we are doubtful that evidence of cannabis possession was the lynchpin that convinced the jury that defendant was the shooter on August 23, 2011, where there were two eyewitnesses, who may have not been neutral, but provided largely consistent accounts of the shooting to the detectives and assistant state's attorneys. Additionally, defendant provided an inculpatory statement to the police that was not memorialized but nonetheless survived an extensive suppression hearing. We would also not characterize that statement as "far from overwhelming" where, after his alibi fell apart, he admitted to ASA Hughes and the detectives that he, Moore, and Dean were armed and looking for Latin Dragons, and when they saw Jackson, they all began shooting at him. We also emphasize that none of the State's evidence was significantly impeached or undermined, and there is no assertion here that the State exacerbated the prejudicial effect of this testimony by referring to it in closing argument.

¶ 89    For these reasons, we conclude that the admission of Officer Smith's testimony was harmless error.

¶ 90                                B. Motion to Reopen Proofs

¶ 91   Next, defendant argues that the trial court erred when it refused to reopen the suppression hearing proofs to admit evidence that Sergeant Johnson lied about the circumstances of taking an alleged confession in the unrelated *Williamson* proceeding. In the alternative, defendant argues that trial counsel was ineffective for failing to present that evidence at the suppression hearing. Defendant requests that we remand for a new suppression hearing.

¶ 92   A trial court has the authority to allow a party to reopen its case where it is warranted under the circumstances, and "[a] motion to reopen may be granted even after the court has ruled on a motion to suppress." *People v. Gonzalez-Carrera*, 2014 IL App (2d) 130968, ¶ 21. In determining whether to reopen proofs, a trial court considers "various factors, including the existence of an excuse for the failure to introduce the evidence at trial, *e.g.*, whether it was inadvertence or calculated risk; whether the adverse party will be surprised or unfairly prejudiced by the new evidence; whether the evidence is of utmost importance to the movant's case; and whether there are the most cogent reasons to deny the request." (Internal quotation marks omitted.) *People v. Figueroa*, 308 Ill. App. 3d 93, 103 (1999). We review the ruling on a motion to reopen proofs for an abuse of discretion. *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 44. An abuse of discretion will be found only when the court's ruling is "arbitrary, fanciful, or unreasonable or when no reasonable person could take the court's view." *People v. Beverly*, 364 Ill. App. 3d 361, 367 (2006).

¶ 93   Here, defendant argues that the trial court's denial of his motion to reopen proofs was based on an erroneous application of the law. "Where it is argued that the court's exercise of discretion was 'frustrated by an erroneous rule of law,' however, our review is *de novo*." *In re Commitment of Holt*, 2022 IL App (1st) 210402, ¶ 56 (quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)).

¶ 94    In the instant case, defendant sought to introduce evidence from *Williamson* to demonstrate that Sergeant Johnson lied during the suppression hearing in that case. The trial court in this case found the evidence not permissible under Illinois law and denied defendant's motion. Notably, the court did not reach the factors for determining a motion to reopen proofs.

¶ 95    Defendant argues that the evidence was relevant to Sergeant Johnson's credibility. According to defendant, the trial court's denial of the motion to reopen proofs was based on the court's misapprehension that our evidentiary rules would not permit the admission of this evidence at trial. We agree with defendant. The evidentiary rules regarding admissibility at trial do not apply to pretrial suppression hearings. Ill. R. Evid. 104(a) (eff. Jan. 1, 2011) ("the court is not bound by the rules of evidence except those with respect to privileges" when determining preliminary questions of admissibility). Additionally, the State does not dispute defendant's assertion that this evidence would have been admissible at his suppression hearing, and instead, focuses on the above-listed factors. Thus, the State has forfeited any argument to the contrary. See Ill. S. Ct. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited[.]"). Accordingly, we conclude that the court's ruling was based on an error of law.

¶ 96    Nonetheless, "[w]e may only grant relief if the court's error prejudiced [the] defendant, as harmless errors do not require reversal." *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 24. Here, we determine that defendant was not prejudiced by the court's ruling. Even had counsel presented evidence of Judge Obbish's credibility ruling in the *Willaimson* case here at defendant's suppression hearing, and the trial court found Sergeant Johnson not credible, the testimony from ASA Hughes remained unimpeached. ASA Hughes testified that defendant was informed of his *Miranda* rights multiple times and defendant orally provided an inculpatory statement to her after

being advised of those rights. Thus, admission of that evidence would likely not have changed the outcome of the hearing.

¶ 97    Additionally, the court's ruling is supported by our finding that the factors for reopening proofs weigh in favor of denial. First, the failure to introduce the evidence at the hearing may have been inadvertent, rather than calculated. However, no reasonable excuse is apparent from the record where defendant was represented by the public defender's office from the beginning of this case until after this matter was taken under advisement. Second, the State concedes that there would not have been any surprise or prejudice. Third, the evidence was not of the utmost importance to defendant's case where there was sufficient other evidence presented at the hearing that defendant understood and appreciated his *Miranda* rights such that the outcome did not hinge on Sergeant Johnson's credibility. Lastly, there was a "cogent reason" to deny the motion. The trial court had ruled on defendant's motion to suppress two months prior, and the State had appropriately disclosed this information in a timely manner prior to the suppression hearing. Extending litigation on this issue would further delay defendant's case which had already been pending for five years. For these reasons, we conclude that the court did not err in denying the motion to reopen proofs.

¶ 98    Defendant also argues, in the alternative, that his counsel was ineffective for failing to introduce this evidence at the suppression hearing where the State had disclosed it prior to the hearing. A defendant is guaranteed the right to the effective assistance of counsel under the United States and Illinois Constitutions. U.S. Const. Amends. VI, XIV; Ill. Const. of 1970, Art I, § 8. To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[A] court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient." *People v. Johnson*, 2021 IL 126291, ¶ 53.

¶ 99    Here, defendant cannot satisfy the prejudice prong. To establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As we explained above, defendant was not prejudiced by the court's denial of the motion to reopen proofs. Because defendant cannot show prejudice, he cannot succeed on an ineffective assistance of trial counsel claim. See *People v. Patterson*, 192 Ill. 2d 93, 107 (2000) ("failure to satisfy either prong precludes a finding of ineffective assistance of counsel").

¶ 100                              C. Sentence

¶ 101   Defendant sets forth three arguments regarding his 60-year sentence: (1) the sentence violates the eighth amendment of the United States Constitution; (2) the sentence violates the proportionate penalties clause of the Illinois Constitution; and (3) the sentence is excessive.

¶ 102                           1. Eighth Amendment

¶ 103   Defendant first asserts that his sentence violates the eighth amendment because he is a juvenile offender and received a *de facto* life sentence, consisting of two consecutive 30-year terms. In response, the State contends that because defendant has a meaningful opportunity for release before he serves more than 40 years in prison, he cannot mount a successful eighth amendment claim.

¶ 104   The eighth amendment prohibits "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). In *Miller*, the United States Supreme Court held that the prohibition on cruel or unusual punishments

in the eighth amendment forbids mandatory life sentences without the possibility of parole "for those under the age of 18 at the time of their crimes." *Miller*, 567 U.S. at 465, 479. Further, *Miller*'s holding requires that a sentencer must consider certain factors relevant to a juvenile's youth and its attendant characteristics prior to the imposition of life sentence without parole. *Miller*, 567 U.S. at 469-70. Illinois courts have held that *Miller* also applies to *de facto* life sentences (*People v. Reyes*, 2016 IL 119271, ¶ 9), which is a prison term that exceeds 40 years (*People v. Buffer*, 2019 IL 122327, ¶¶ 40-41).

¶ 105   After briefing was completed in this matter, our supreme court issued its decision in *People v. Spencer*, 2025 IL 130015. There, the defendant, who was 20 years old at the time of the offenses, was found guilty of first degree murder, attempted murder, and home invasion, and sentenced to an aggregate 100 years in prison. *Id.* ¶¶ 5, 16. On appeal, the defendant argued that the trial court imposed a *de facto* life sentence, which violated the proportionate penalties clause. *Id.* ¶ 23. After clarifying that *Miller* only applies to juveniles, our supreme court then explicitly found that, pursuant to the Illinois youth parole statute, youthful defendants had a meaningful opportunity for release prior to spending 40 years in prison. *Id.* ¶¶ 48, 35. According to the court, because the defendant would be eligible for parole after 20 years, he was therefore not subject to a *de facto* life sentence. *Id.* ¶¶ 39-40.

¶ 106   Although *Spencer* involved a 20-year-old youthful offender, the same parole statute was at issue, which affords individuals under 21 years old at the time of a nonhomicide offense eligibility for parole review. See *People v. Tolliver*, 2025 IL App (1st) 231485, ¶ 43 (rejecting a juvenile defendant's attempt to distinguish *Spencer* on the basis of age). In this instance, defendant will be eligible for parole after serving 10 years of his sentence. 730 ILCS 5/5-4.5-115(b) (West 2022). The statutory scheme also provides second and third opportunities for parole five years apart. *Id.*

§ 5-4.5-115(b), (m), (n). Therefore, defendant has multiple meaningful opportunities for release prior to serving 40 years in prison. In accordance with *Spencer*, we conclude that defendant's 60-year sentence does not constitute a *de facto* life sentence and thus, this claim is without merit. See *People v. Spahr*, 56 Ill. App. 3d 434, 438 (1978) (the appellate court is bound by the decisions of the Illinois Supreme Court).

¶ 107                    2. Proportionate Penalties Clause and Excessive Sentence

¶ 108   Next, defendant asserts that his sentence violates the proportionate penalties clause of the Illinois Constitution or is otherwise excessive. In response, the State contends that, considering the nature of the offense, the harm to the victim, and defendant's poor rehabilitative prospects, his 60-year sentence is neither "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community" (*People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002)) nor excessive. We agree with the State for the following reasons.

¶ 109   The proportionate penalties clause of the Illinois Constitution requires that "[a]ll penalties *** be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The Illinois Constitution, with its proportionate penalties clause, "goes further than the eighth amendment in offering protection against oppressive penalties and sentences" (*People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 43), and "[a] defendant may challenge a sentence of any length" under the proportionate penalties clause (*Spencer*, 2025 IL 130015, ¶ 43; *People v. Hilliard*, 2023 IL 128186, ¶ 29). A defendant's sentence violates the proportionate penalties clause where "the penalty imposed is 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *People v. Clark*, 2023 IL 127273, ¶ 51 (quoting *Leon Miller*, 202 Ill. 2d at 338).

Our review of the constitutionality of defendant's sentence is *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 110 When conducting our proportionate penalties analysis, it is important to consider that Illinois courts have recognized the "special status" and "enhanced potential for rehabilitation" among juvenile offenders prior to *Miller*. *Leon Miller*, 202 Ill. 2d at 340-343. As a result, in sentencing a juvenile, courts are constitutionally required to consider all factors in aggravation and mitigation. *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 72. These factors have now been codified, and the sentencing court must consider the following in mitigation:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, domestic or sexual violence, sexual exploitation, physical abuse, or other childhood trauma including adverse childhood experiences (or ACEs);

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history;

(9) the person's involvement in the child welfare system;

(10) involvement of the person in the community;

(11) if a comprehensive mental health evaluation of the person was conducted by a qualified mental health professional, the outcome of the evaluation; and

(12) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2022).

¶ 111 In the case before us, the court explicitly considered the *Miller* factors in imposing defendant's sentence. Specifically, the court acknowledged defendant's age, stated that the sentence was discretionary, and noted defendant's gang membership and its accompanying influence, defendant's emotional disability, the "outrageous" and "shocking" circumstances of the offense, defendant's role in planning to kill a rival gang member, his minimal prior juvenile criminal history, and his lack of apology in his statement in allocution. The court then spent a great deal of time addressing defendant's rehabilitative potential, of which the court determined defendant had none. This was based on the extensive testimony of defendant's multiple serious infractions and criminal offenses which he had committed during his incarceration up to that point in time. These included defendant's attempted escape after arrest, multiple cases of battery upon correctional officers, and public indecency offenses involving female correctional officers. According to the court, there was "not a scintilla of rehabilitative potential" in defendant and defendant is not a "victim of transient immaturity of youth." Although the court did not expressly address each individual factor in turn, that is not required. A trial court "need not articulate each factor it considers in rendering the sentence for a juvenile offender, and that omission does not

mean the trial court did not consider all relevant factors." *People v. Merriweather*, 2022 IL 210498, ¶ 31 (citing *People v. Villalobos*, 2020 IL 171512, ¶ 74). In any case, nearly every factor was mentioned in the court's sentencing colloquy. Thus, it is clear from the record that the court appropriately considered defendant's youth and its attendant characteristics in fashioning his sentence.

¶ 112    Moreover, we find that defendant's sentence was determined "according to the seriousness of the offense and with the object of restoring the offender to useful citizenship." In fact, from the record, it appears that the weight of both of those factors led the court to impose the maximum sentence here, and we can find no fault with that. Defendant's actions on August 23, 2011, demonstrate complete disregard for the lives of others, where he fired a gun numerous times on a neighborhood street while chasing Jackson. As a result of his careless actions, Melanie, a 13-month-old child suffered a gunshot wound to her head that irreparably harmed her and changed her life, as well as her mother's, for the foreseeable future. Defendant also clearly disregarded his own future on that day and has continued to show little concern for others or himself through his actions while incarcerated. Defendant physically injured multiple correctional officers, engaged in sexual misconduct or harassment towards female correctional officers on more than one occasion, and caused damage to the prison facilities by urinating and smearing feces on the floor of the day room. The mitigating factors of his youth, gang influence, and minimal juvenile criminal history were not enough to reduce the impact of this crime or his actions since, and we cannot disagree with the court's conclusion. Therefore, we do not find that defendant's sentence is 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Clark*, 2023 IL 127273, ¶ 51 (quoting *Miller*, 202 Ill. 2d at 338).

¶ 113    Nor do we find that defendant's sentence is excessive under traditional sentencing review.

¶ 114   The Illinois Constitution requires that a sentence achieve a balance between the seriousness of the offense and the defendant's rehabilitative potential. *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008) (citing Ill. Const. 1970, art. I, § 11). Where a sentence is within the applicable statutory range, it will not be considered excessive unless it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 210. Notably, the seriousness of the offense is one of the most important factors for the court to consider. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010).

¶ 115   We give great deference to the trial court as it has discretionary powers in imposing a sentence. *Stacey*, 193 Ill. 2d at 209. Thus, we will not disturb the sentencing decision absent an abuse of discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). This deference is owed "because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). In particular, the trial court is in the best position to consider "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. [Citation.]" *Stacey*, 193 Ill. 2d at 209.

¶ 116   Here, defendant's 60-year sentence, based on two counts of attempt first degree murder, does not exceed the statutory maximum sentence. 720 ILCS 5/8-4 (West 2022); 720 ILCS 5/5-4.5-25 (West 2022) (attempt first degree murder is a class X felony, punishable by six to 30 years' imprisonment). Thus, his sentence is presumed proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 4.

¶ 117    Additionally, as we explained above, the trial court appropriately considered all evidence presented in mitigation and aggravation at the sentencing hearing. Specifically, the court determined that defendant had no rehabilitative potential and found this "shocking" crime to have caused serious harm. The court also found that defendant lacked remorse and failed to apologize in his statement in allocution. See *People v. Ward*, 113 Ill. 2d at 528 (under certain circumstances, a continued protestation of innocence or lack of remorse may be relevant to the court's consideration of a sentence). After weighing all of the factors, the court concluded that a maximum sentence was appropriate. Based on the circumstances of this case, we cannot say that defendant's 60-year sentence varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. See *Stacey*, 193 Ill. 2d at 210; see also *People v. McGowan*, 2013 IL App (2d) 111308, ¶ 10 (we may not overturn a sentence merely because the relevant factors could have been weighed differently).

¶ 118    Defendant cites *People v. Hill*, 2022 IL App (1st) 171739-B, several times throughout his argument in asserting that the 60-year sentence was not justified. That case, however, is inapposite. In *Hill*, the defendant, who was 15 years old at the time of the offenses, was found guilty of two counts of first degree murder and one count of attempted first degree murder and sentenced to a mandatory term of life in prison. *Id.* ¶ 1. Following appellate proceedings, the defendant was resentenced to an aggregate 60-year sentence. *Id.* On appeal, this court found that the trial court abused its discretion in failing to adequately account for "the deluge of expert testimony explaining [the defendant's] diminished culpability and rehabilitative potential." *Id.* ¶ 44. In particular, the court noted that an expert repeatedly linked the defendant's participation in the crimes with his youth, and the defendant had demonstrated rehabilitation as an adult with exemplary behavior while incarcerated. *Id.* ¶¶ 46-49. In fact, there was testimony presented that defendant was a

"model inmate" and maintained multiple jobs in prison. *Id.* ¶¶ 12-20. Here, there was no expert testimony specifically linking defendant's youth to his crimes and defendant had the opposite of an exemplary record while incarcerated. As the trial court noted, he did not present a single certificate showing any rehabilitation, as opposed to most of the defendants who appeared before the court. Defendant's dearth of rehabilitative evidence provided support for his lengthy sentence and directly contrasts the defendant's circumstances in *Hill*.

¶ 119 Nonetheless, defendant asserts, as to both his proportionate penalties argument and his excessive sentence argument, that the trial court "improperly treated [his] emotional disability as an aggravating factor, when it was instead a mitigating factor." The State contends that this particular argument is forfeited because there was no contemporaneous objection and defendant's motion to reconsider his sentence did not raise this issue. To preserve claims for appeal, a defendant must make both a contemporaneous objection and file a written postsentencing motion raising the issue. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). In his reply, defendant does not dispute that this error was not properly preserved. Instead, he requests that we consider this issue for plain error.

¶ 120 The plain error doctrine is a narrow and limited exception to forfeiture. *Id.* at 545. To obtain relief under this doctrine in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* Whether forfeiture may be avoided under either of these theories requires us first to determine whether a clear error occurred. *People v. Garcia*, 2023 IL App (1st) 220524, ¶ 18. Here, we find no clear error.

¶ 121 The burden is on the defendant to affirmatively establish that the sentence was based on the consideration of an improper factor, and we will not reverse a sentencing decision unless it is

clearly evident that the sentence was improperly imposed. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. "We consider the record as a whole when determining whether the trial court improperly imposed a sentence, and will not focus on isolated statements." *Id.* ¶ 50. Finally, not every factor in mitigation will be applicable in every case. *Merriweather*, 2022 IL App (4th) 210498, ¶ 31.

¶ 122   Defendant cites to the Code of Federal Regulations for support of his argument that his emotional disability is "a mitigating cognitive issue." The Code lists "[e]motional disturbance" as a disability term for purposes of defining a child with a disability. 34 CFR § 300.8(c)(4)(i) (eff. July 11, 2017). Emotional disturbance is defined as "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance[.]" *Id.* Those characteristics are:

"(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems." *Id.* § 300.8(c)(4)(i)(A)-(E).

¶ 123   The regulation suggests that an emotional disability, such as defendant's, may constitute a disability affecting a child's performance in school, akin to a learning disability. However, we are not inclined to accept the regulation as similarly applicable to the trial court's sentencing determination, especially where, as here, experts conducted psychological evaluations of

defendant. Both experts stated that defendant had behavioral problems with Dr. Neu characterizing defendant as having "a significant conduct disorder" and Dr. Kavanaugh noting defendant's "inability to manage his emotions and behavior." Although there was some evidence presented that defendant's behavioral issues were mitigated while on medication for ADD or ADHD, Dr. Neu pointed out that defendant had been in custody at the Cook County Jail for four years without receiving a diagnosis or prescription for either of those disorders. In fact, Dr. Neu testified that the jail psychiatrist noted that defendant appeared fully oriented with no cognitive impairment and there was no indication in the records from his two hospital visits after his arrest that he had any cognitive issues. Additionally, both experts acknowledged that defendant's school records showed that he had an average IQ, and the detectives and assistant state's attorneys all testified that defendant's answers to their questions were responsive and appropriate. Thus, although an emotional disability may constitute a cognitive disability, there is no evidence of that in the case before us.

¶ 124  In imposing defendant's sentence, the court stated that the "investigation" revealed an emotional disability, not a developmental or cognitive disability. The court continued: "And a careful reading of some of these things indicates that we're bordering on just behavioral problems and an inability to confine himself to rules, regulations, or laws." The record is clear that the court understood the factor and determined that it was not applicable based upon the experts' testimony in this specific case. Moreover, the court had personally observed defendant in court for four years at the time of sentencing, had the opportunity to assess defendant's mental state, and concluded that defendant did not suffer from any cognitive or developmental delay. Having observed defendant, the court was "in a far better position to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits" and

therefore, we will not substitute our judgment for that of the trial court. (Internal quotation marks omitted.) *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 41.

¶ 125   Finally, we reject defendant's argument that the court considered his emotional disability as an aggravating factor. There is no affirmative evidence in the record to suggest that the court actually considered his emotional disability in aggravation. Nonetheless, in defendant's view, the court should have disregarded his behavioral issues while incarcerated as a result of his emotional disability. However, once again, the record belies defendant's assertions that his emotional disability rendered him unable to control his behavior. His BCX included a social worker's notation that he could control his behavior but did not want to and defendant admitted to Dr. Neu that he threw temper tantrums and made suicidal gestures when he did not get what he wanted.

¶ 126   It is imperative that a trial court's sentencing decision is based upon a defendant's unique facts and circumstances, and the court did exactly that in this case. Thus, defendant's sentence was not based on improper considerations, and the court did not err in that respect. See *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010) (no plain error where there was no error at all). Because we conclude that defendant's sentence does not run afoul of the constitution and is not excessive, his 60-year sentence is affirmed.

¶ 127                                    III. CONCLUSION

¶ 128   For the reasons stated, we affirm the judgment of the circuit court.

¶ 129   Affirmed.